Next up we have case number 2410086, Emma Prospero v. Deputy Ryan Sullivan et al. Emma Prospero v. Deputy Ryan Sullivan et al. Brad Watkins Good morning. I'm Brad Watkins and I represent appellants Lieutenant Prescott and Deputy Sullivan. We're asking this court to reverse the denial of qualified immunity to the defendants. As this court knows, this case arises out of the arrest of Emma Prospero pursuant to a 2018 arrest warrant charging her with a misdemeanor offense of unlawful conduct during a 911 call. I'd like to start with what we believe is the District Court's clearest error in the defendant's most straightforward path to qualified immunity, and that's an evaluation of whether her arrest would have been justified without legal process. Our position is that the District Court erred because it failed to employ the collective knowledge doctrine which imputed to the officers the dispatcher's knowledge of two important things, two pieces of information, and that if the District Court had imputed this information to the dispatchers, the two nonaffidavit jury issues identified by the District Court would have disappeared. Let me ask you a question about this collective knowledge doctrine. I'm struggling a little bit to see how it helps you, and maybe you can help me see that point.  So Prescott doesn't remember his interaction with Prospero, and the dispatchers told Sullivan how they felt about the situation, and Sullivan didn't interact with anyone else. So how does Sullivan really benefit from collective knowledge? Well, two things. First, Prescott, I believe his testimony was that he did not remember his interactions in responding to those five non-redressable calls. He didn't remember any further interactions with Prospero and may have heard other radio calls about her. The information that's critically important is the information known, which the District Court found was known by the dispatchers, and particularly Dispatcher Flowers, and that information is as follows. It is that she was a serial 911 caller, and Flowers knew this information and knew that she continually called 911 about the same shooting noise behind the same gas station in this 40-acre, rural, unincorporated area of the county, and that the officers would respond and investigate that shooting, and continually, as the District Court said, repeatedly investigated the gunfire and repeatedly came to the same conclusion that the gunfire was legal and safe. And so that is really important information that Flowers knew, and this is on pages 47, 52, 54, 55, and 162 of her deposition. And so, as the District Court found, and we're not asking the court to go back and review these findings of fact, we're embracing them, because if Flowers knew this information when she took the calls, that's materially important. The question that Flowers was never asked is, did this play a part in you determining and deciding, based on hearing every word of the calls, that the calls were purposely disruptive, which is what she reported to Sullivan. That question was never asked of her, and I would argue it probably did enter into her calculus as to why she felt like these three calls on this particular day were purposefully disruptive. And the other piece of information that's really important is, these dispatchers heard every single word of the calls. They came into the calls with the history I just mentioned, and then they heard every single word of the calls. And of course, the other side argues, well, the officers weren't entitled to rely on what the dispatchers told them, and they weren't entitled to just look at the CADs, which were the dispatchers' reporting of the calls. They had to do more. They had to go one step beyond and listen to the calls. But the dispatchers who heard every word of the calls believed that Prospero was purposefully disruptive in the calls. And these dispatchers are certified communication officers with far more call handling experience than the officers. She would equate this to when an officer calls another officer and says, hey, this guy broke into this house, and we chased him off, I'll need you to arrest him. That's a type of collateral information that is imputed to an officer. Some people call that vertical. There's vertical and horizontal in other circuits. I don't know that the 11th Circuit has... Yeah, but whatever. I understand your argument to be, if this guy conveyed that to the officer, if the officer had conveyed directly to this officer, hey, this one has been making a series of calls, you don't know about it, but we do, arrest her under this deal, that would be the equivalent of the dispatcher who is also sworn as an officer conveying the information in gross to this officer. That's exactly right. Because that information, and these other 911 cases talk, and they're from district courts all over the country, they talk about sort of the history of knowledge and how that's relevant of prior calls. Same thing in this case. This was a fact, and it's undisputed, that the dispatchers knew this. And you can hear in the call log between the deputy and the dispatcher where the dispatcher says, oh, we know who this is. And of course, then she testified to that exact knowledge. So, yes, if that information is imputed to Deputy Sullivan, that does a couple things. One, if it's imputed to Sullivan, the two jury issues that the district court identified, one was, how did Sullivan learn that the property behind the Chevron was a hunting club where shooting was lawful? Well, imputing this information makes that issue go away. And of course, on that point again, we say even if you don't impute that information, the district court erred because the district court held that the officer was required to know as a fact that information and could not assume it. The district court phrased that jury issue as, did Sullivan know or did he assume that information? Well, officers can make reasonable assumptions that can be proven incorrect later on. Now, this assumption turned out to be correct. And how do we know that? We know that because Pauk, the landowner, submitted an affidavit saying, I was shooting that afternoon, doing so safely on my target range. He provided videos of it and pictures of it. No evidence in the record that anybody else was shooting. Sullivan knew that there was a shooting range on that property where shooting was done safely and lawfully. He knew the direction of the shooting range from conversations with Pauk's family and with other officers. So even if you don't go to collective knowledge, the court erred in its conclusion that you couldn't assume facts, reasonably so, and that was a reasonable assumption. The other thing collective knowledge does is it nullifies the second jury issue that the court identified, which was why Sullivan believed that the calls were disruptive. How he learned that information. That was what the district court said. There's a jury issue as to how Sullivan learned the information that the calls were disruptive. Well, if you impute the dispatcher's knowledge of the calls, every word of the calls, that resulted in their belief that the calls were disruptive. Now, keep in mind, the dispatchers knew the history of this person calling. The dispatchers also knew that she had called the non-emergency number twice before calling the emergency number. Of course, Prospero had been instructed by the sheriff to not call the emergency number unless she had an emergency prior to this incident. And so the dispatchers know this person's calling non-emergency number, non-emergency number, doesn't get the result she likes. She calls the emergency number. She argues with the dispatchers to the point that dispatcher one had to get his supervisor to take over the call, which the dispatchers say was a very, very rare occurrence. She threatens to go to the TV stations. She threatens to go to the governor because she's not getting the results she wants, which, by the way, there's plenty of evidence in the record that that was her playbook. That's what she did. She threatened the sheriff with the same thing prior to this incident. And so all the deputies can do is offer for a deputy, all that dispatchers can do is offer for a deputy to come out to talk to her. She refuses that six times. And she testified that if she believed this was a safety issue, that she would have wanted the deputy contact. Well, she didn't want deputy contact. She refused it six times. And her misunderstanding was, and this is the crux of why there was this misunderstanding between Prospero and the dispatchers. Prospero testified that she wanted the dispatchers to tell the officers to go stop the shooting. The dispatchers can't do that. All they can do is communicate with the officer and then ask the caller if they want deputy assistance, which was done and turned down six times. And so if the dispatchers, again, who heard every word of these calls, and courts in this And this circuit has recognized that officers can rely not just on dispatchers, but on anonymous 911 callers for probable cause. But in this case, you have officers relying on the dispatchers' word, not an anonymous caller. And... You can rely on anonymous calls if corroborated. That's correct. There is a test for reliance on anonymous calls, true. But, again, our position is, if you're going to reach the conclusion that no reasonable officer could conclude that Prospero was disruptive in her calls, then you have to find that the dispatchers, both of them, were unreasonable and that no reasonable dispatcher should have concluded that. So you can't have one without the other. But you either have to find that the dispatchers who heard every word of the call, that essentially they violated Prospero's constitutional right, because no reasonable dispatcher can conclude that. You have to reach that conclusion if you're going to reach the same conclusion about the officer. I see my time is just about up, and I'll reserve that for rebuttal. Thank you.  May it please the Court, my name is Grace Lane, and I represent, I believe, Mrs. Emma Jane Prospero in this case. With the Court's permission, I would like to split today's argument with my co-counsel, Claire Norenz. I will begin with the malicious prosecution claim and reserve five minutes for my co-counsel to address the First Amendment retaliation claim. Why did your client adamantly refuse to have any officers come to her house? Your Honor, that is not particularly relevant as to whether Sullivan had probable cause. I don't know whether it's relevant if you'll answer the question for me. It's not clear why she denied contact on that day. It was a holiday, and she just wanted the disturbance to be addressed. That's one way, but what about the other five? I'm sorry? What about the other five occasions she said, no, don't send anybody out here, I won't come to the door? Your Honor, Mrs. Prospero's actions are not as relevant as the record that... Tell me why she said that, and we'll decide whether it's relevant or not. You can say, here's the reason, or I don't know, but here's why it's irrelevant, but don't cut our questions off with a response that we shouldn't be asking. I apologize, Your Honor. I don't know exactly why Mrs. Prospero did not want to engage after... She wasn't asked that in any deposition or anything? I'm not sure, Your Honor. We'll reserve that to my co-counsel. To begin, I'd like to jump straight to the collective knowledge doctrine that was just discussed extensively. First, I'd like to point out that appellants did not raise the collective knowledge doctrine in the district court until their SIR reply opposing our affirmative summary judgment motion on probable cause, and they never raised it at all in their own summary judgment motion. This explains... I'd like to touch on that before you waste any more of your time. We have an obligation to decide issues, and they did raise the issue of qualified immunity, and arguments about under the collective knowledge doctrine this or under this other doctrine that, those are arguments, and you don't forfeit arguments, you forfeit issues. I'm not sure, at least speaking for myself, I'm not convinced that they didn't raise it below, so you can't consider it now. Understood. They may buy into your argument, so go ahead. If the court does consider the collective knowledge imputed to Sullivan, the court... That scant knowledge must still be weighed in compared to all of the exculpatory information that Sullivan also knew. The dispatchers explicitly said to Sullivan on the phone that her purpose was to get the gunshots to stop. Additionally, there is a lot of dispute in this case around the conversation between Flowers and Sullivan, and whether that even happened at all. And at this stage... What was the purpose to get the gunshots to stop weighing more favor? The statute under which Mrs. Prospero was charged requires that she be calling with the purpose to disrupt the 911 dispatch center. Are those mutually exclusive, that she says, I want these to stop, I want to enjoy my dinner in peace? Does the fact that we know what she wanted, does that cut against her satisfying the elements of that statute? Yes, Your Honor. Your Honor, for that, I would point you to persuasive authority from this court in a case that this court affirmed, Tuggle v. Hill, where a man called the... It's a non-published case. I assume that's why you're saying persuasive. It is a non-published case, but it's a case in which a caller called the sheriff's office and used very harassing language, calling him scum and a short little bastard. That's a direct quote. But he stated that he wanted to set up a meeting with the sheriff, and then the court found that because he had explicitly stated a lawful purpose in calling, that that did not meet the intent to harass element there. Furthermore... Didn't she have a lawful purpose, though, if she had been told repeatedly that the gunshots were legal on that property? Mrs. Prospero had not been told repeatedly that the gunshots were legal on that property. On that day in question, she was not even told not to call back. She was told that they were lawful, and then the gunshots kept continuing, and she grew more and more fearful and called to ask about why there was no response. She was also under the impression that this was a different response than the dispatchers had done in the past, where if she had ever called about gunshots, they had gone out there and addressed them. And so she was concerned about why today would be different that day in November 2018. But she knew that, she'd been told that the deputies were not going to respond. She was told that on the second phone call, yes, Your Honor. She grew continually more fearful as the shots continued. But she kept calling after she was told. She called 911 one more time after that. Even on non-emergency lines, she had been told the deputies are not going to respond to this call, and she called 911. She did call 911 at that point, as she sat in her house and grew more and more fearful and was concerned that there was no response to this. So that means the facts of this case are very different from the persuasive authority you just talked about, correct? They are slightly different in that way. However, at this stage in the litigation, all the factual disputes here must be resolved in favor of Mrs. Prospero. And there are significant factual disputes. The most prominent of those is this discussion between Flowers and Sullivan, in which he essentially hangs his hat and says, establishes probable cause for this, or arguable probable cause. The fact that this was the first time that alleged conversation was ever brought up was in Sullivan's deposition several years after the arrest warrant was executed and filed. Sullivan did not recall who told him that information, just that it might have been Archibald or Flowers. And then Flowers, who was deposed prior to Sullivan, did not mention it in her deposition. And it's oddly absent from the arrest warrant itself, despite Sullivan testifying that he would include everything in the affidavit that he believed supported probable cause. If he believed that the dispatcher saying to him explicitly that she was being disruptive was the support for probable cause, it is extremely odd to not include that in the warrant. Additionally, there is zero record of this conversation. An assertion that this call was harassing the dispatch center directly contradicts all the undisputed evidence and statements that are recorded that day between dispatch and Sullivan, in which they repeatedly state that she would like the gunshots to stop. Additionally, Flowers testified to having a very close relationship with Sullivan. Specifically, she testified that it's, quote, all one big family, ma'am, and that we all have each other's backs. All of these facts, at the very least, that can indicate significant bias in which she would help collaborate with creating this potentially post-talk conversation. You just described what would hopefully be any good police department anywhere in the country. What more do you have to suggest that that team-oriented approach is in any way suggestive of bias? What evidence of bias do you have? The team-oriented approach can suggest bias here. When there are these other facts in combination that would suggest that this was decided, that this conversation happened after the litigation had begun. When it was decided it happened, you're talking about it occurred in a deposition. Yes. So you're faulting somebody for having a good memory at a deposition. The conversation happened, or it was brought up first in Sullivan's deposition, and then it was not brought back up by Flowers until she submitted a declaration. I would suggest, Your Honor, that none of them had a particularly good memory of this. They couldn't remember how it happened, whether it was on the phone or in person, or Sullivan could not even testify who said this to him. At the very least, these facts create a factual dispute as to whether the conversation happened, and if it did... Are you hanging your hat on the failure of memory, or maybe someone has too good a memory later, on the fact that it was missing from the affidavit? Your Honor, I do believe that that is suggestive to the fact that this perhaps did not happen, because if that is this important to his probable cause determination, then you would expect that it would have been included in an affidavit. But of course, their argument is that the arrest was justified without legal process. Yes. And that expands to whether this knowledge would be imputed, and that is where this factual dispute is relevant, and under the standard at this time, all the facts must be construed in favor of Mrs. Prospero, which would indicate that this did not happen, and Sullivan could not rely on that. Is the only way to win if we say that what you're being nice in calling a faulty memory is at least the implication that this is made up? Do we have to think that the police officers and the dispatchers are not telling the truth for you to win? You do not have to think that they are not telling the truth. You just have to decide that this is a genuine dispute of fact that must be left to the jury. And I see that my time has expired. If I may, I would like to reserve five minutes to my co-counsel. Good morning, Your Honors. Claire Norenz for Appley Imaging Prospero. I do want to answer Judge Karn's question about why Mrs. Prospero did not want contact with the deputy. She states in the recordings of the calls, which I do hope you will take a chance to listen to as they are quite relevant here, she says, I don't want police at our house. I don't want it to look like we're doing something wrong. We're not the ones doing something wrong. She had been told in the past that she should call if she heard gunshots and that officers did not need to come to speak with her to go to the scene where she described the gunshots coming from. So that was her thought process. Let me ask you this. Can't the officers take into account the plausibility of, I'm scared the shots are endangering us, but I don't want people to think we've done anything wrong, so don't come to the house? So I think that there was nothing preventing Sullivan from going to the scene where she described the shots originating to see how they were being fired and who was firing them. He did not need to speak with Mrs. Prospero in order to do that and he testified to that as well. I'm sorry, maybe I misunderstood. Can't he consider the plausibility of someone who thought they were actually endangered versus someone who said, but I'm concerned about appearances, so don't come to my house? Of course he can consider everything that's within his knowledge on that day. I also wanted to address the issue of why she would call 911 after she had been told that the gunshots were on private property and therefore lawful. If you look at document 127-3 in the record, that is a letter to Mrs. Prospero from the Sheriff's Office explaining the multiple ways in which shots on private property can nonetheless violate several provisions of the Georgia Code. So she had knowledge that even if shots were on private property, they might still be unlawful in how they were being discharged or the direction they were being shot in or their proximity to a public road. So therefore when the shots, and keep in mind this was a barrage of many, many shots, she believes there was more than one shooter, when that was continuing and when she had been told no one was going to come out to see what was going on, at that point she did feel it was an emergency that she needed to call 911 for. So turning to the First Amendment claim, it was not error for the District Court to consider Mrs. Prospero's subjective intent on Thanksgiving Day 2018. On that day as well as on all prior dates that she called for assistance, she was calling in good faith to report conduct that she believed was unlawful. And on its face, her communications to 911 on that Thanksgiving Day were protected. So first, she stated several times that she was calling for the purpose of getting the gunshots stopped because she believed they were violating the noise ordinance and they were coming too close to people's homes. So she was engaging in petitioning of a government agency for help or redress, and that's clearly protected under the First Amendment. In the Supreme Court's decision in 1972, Trucking Unlimited, it states that the right to petition for redress of grievances extends to all departments of the government, so that would include police departments and sheriff's offices. What about the case United States v. Eckhart from 2006, holding that phone calls were not constitutionally protected speech when their overarching purpose was to harass and frighten another person? So here, the purpose, as she repeatedly stated, was to get the gunshots stopped, and that is what the dispatchers told Sullivan. So in all of their recorded conversations with Sullivan, they told him, she's calling to get the gunshots stopped. She just wants y'all to get it taken care of. What I'm hearing from both you and your co-counsel is because her purpose was to get the gunshots stopped, that's where our inquiry ends, there can be multiple purposes. I think everybody agrees she wanted the gunshots stopped. But where we're having an argument is whether the purpose was also to be harassing, to, I'm sorry, I don't have the statute in front of me, the statutory language. Sure, it's to call for the purpose of disrupting the 911 service. So just because she wanted the gunshots stopped did not mean she also had a purpose to disrupt the service. There's no indication she had any purpose to disrupt. She called very briefly. She was very clear and to the point. She was polite. Again, I would strongly encourage, if you haven't already, to listen to the recordings because they paint a very different picture of what happened than the way the defendants characterize it. This is where the multiple calls work against your client, that she's calling the non-emergency line, she is told on the second call to the non-emergency line that no one is going to be responding to this and then she picks up the phone and calls 911. Well, she's hearing gunshots that are continuing in quite numerous amounts and she's been told no one's coming. She's scared and she doesn't understand because this is not how they responded in the past and so she calls again to say this is still an issue. Can you please send someone out? It's coming too close to people's homes and it's violating the noise ordinance. So, this was clearly speech that was in pursuit of petitioning the government for redress of a concern. Additionally, in her 911 call, she criticizes the deputy's refusal to come out to investigate and verbal criticism of the police is a clearly protected category of speech under Houston v. Hill. Let me finish this. Suppose they hadn't arrested her on this occasion and she had kept home. Shots keep being heard, she keeps on, day after day, week after week, month after month. When does it become for the purpose of harassment? So, I think, first of all, you would need more than one call to 911. Of course, that's why I gave you that hypothetical. And then I think also you would have to look at, you know, what was her stated purpose. Her stated purpose is to get the shots stopped. And then had she been told not to call back. Okay, if she had been told not to call back and she repeatedly did call back, that would be a different case. She was not told not to call back. All they said was on the first call, when it was her on the phone, they said, thank you for letting us know, we'll get an officer out there. On the second call, which was her husband calling. You're isolating this one thing, but they had a history of calls from her. Not in recent temporal time to this call. Her last call before things. She waits a few days or weeks? No, it had been at least six months since she'd called the sheriff's office. This particular officer did not know any of her history. There is no allegation that the dispatchers told him about her history. When they say they want to impute that knowledge to Sullivan, they want to impute it without it ever being actually told to him on the day of. And he testified he had no knowledge. His probable cause of termination was based purely on the three calls of Thanksgiving Day. And so to suggest that this court should counterfactually apply the collective knowledge doctrine is not supported by any of the cases cited by appellants. So I also want to, if I could return. Well, my time is up, so I'll conclude there. But we would ask your honors to affirm the district court's finding that there are issues of credibility, disputes of fact that have to be decided by the jury, and that this case should proceed to trial. Thank you very much. Yes. I just want to address a few of the points that the panel asked about in my remaining time. She refused deputy contact. She testified because she felt safe in her brick house and she would be embarrassed if the cops came to her house. We did brief the collective knowledge issues to the district court. In terms of Judge Branch's question about intent, that's been our argument all along. There's no doubt that she called with the intent to get the shooting to stop. It's the way she went about it that was the disruptive part of it. And that was, again, part of her playbook. She testified that she, when asked in deposition, well, why do you do this? Why do you threaten to call the governor and the TV stations and keep calling? Keep in mind that the history of calls in the record include multiple calls to nonemergency followed by a call to 911, a 35-minute call to nonemergency followed by a call to 911. When asked that question, she said because essentially the more persistent you are, the more likely you are to get the result you want. And that is the disruption. That's the disruption part. And in terms of her intent, as this court is well aware, Deputy Sullivan does not need to establish that intent element for probable cause purposes. It is merely enough that a reasonable officer presented with the same facts would believe there's a substantial chance that she had disrupted 911. I'm sorry? Did you say would believe? Did believe. How about could believe? Could believe. Isn't that what WESB holds? That is. Substantial chance. There's so much confusion. I mean, WESB was pretty darn clear. That's probable cause pure as wood. Could, I'm sorry. Could, yeah. There's so much confusion. Fair enough. What we have said since then is that's qualified immunity. Every time. And you don't need qualified immunity if the same test is for probable cause. But I just find, I take it this is not your first qualified immunity case. It's not. I just find it interesting that you, like me, sometimes misjudge the would and the could. That's right. Well, WESB clarified it, and it is still used interchangeably. But, again, on this, on the core issue here, which is was this a reasonable belief? Again, I just keep coming back to it. If I could argue one point over and over again, it would be if the dispatchers believe this, they're better equipped to make that determination. If they believe this call was purposely disruptive, and Officer Sullivan only needs to believe it was disruptive and not purposefully so, then how can you say no reasonable officer would reach the same conclusion as the inherently reliable dispatchers? And with that, I'll conclude my argument. Thank you. Thank you. I'd like to thank the University of Georgia Legal Clinic for representing Ms. Prospero pro bono. Thank you, Ms. Lyons, Ms. Norenz, and thank you, Mr. Watkins, also for your argument. Thank you. Ms. Lyons, I hope you will realize that our asking you difficult questions means that we treat you just like all the other lawyers do. Thank you. Thank you, Your Honor.